CALIFORNIA POWDER WORKS (GIANT POWDER CO. v.). See Case No. 5,379.

## Case No. 2,316.

### The CALISTO.

[2 Ware (Dav. 29) 37;[1] 3 Law Rep. 69; 23 Am. Jur. 453.]

District Court, D. Maine. March 30, 1840.[2]

MARITIME LIENS—SUPPLIES FOR FOREIGN VESSEL—REPAIRS—MAINE STATUTE—SHIP CARPENTERS—LABORERS.

1. By the general maritime law, material-men, who perform labor or furnish material for building or repairing a vessel, have, in addition to the liability of the owner, a lien on the vessel for their security. But this principle of the maritime law has never been adopted by the common law.

[Cited in Cunningham v. Hall, Case No. 3,481; Francis v. The Harrison, Id. 5,038.]

2. By the maritime law of the United States, material-men have a lien on the vessel for supplies furnished a foreign vessel, but not for supplies for a domestic vessel. And, for the purposes of a lien, every vessel is considered foreign, when in a port of a state to which she does not belong.

[Cited in The Raleigh, Case No. 11,539.]

[See note to Case No. 2,161.]

3. The statute of Maine of February 19, 1834, c. 626 [104, § 1 (Laws Me. 109)], giving to "all ship-carpenters, calkers, blacksmiths, and joiners, and other persons who perform labor, or furnish materials for, or on account of any vessel building or standing on the stocks, by virtue of a written or parol agreement," a lien on the vessel, does not include the case of a laborer hired generally and employed in various work, so as to give him a lien on the vessel, for his wages, for such part of the time as he may have been employed in work for the vessel.

[Distinguished in the Antarctic, Case No. 479. Cited historically in Purinton v. Hull of a New Ship, Id. 11,473. Cited in The Young Sam, Id. 18,186.]

[See note at end of case.]

This was a libel [by Richard Read] against the hull of a new brig, built during the last season by David Spear. It was alleged in the libel, that Spear commenced building the vessel in April last, and that the hull was finished and launched on the 6th of February; that the libellant was employed by Spear in building her, and that there remains due to him, for his services, the balance stated in the schedule annexed to the libel, amounting to $116.64, which he has demanded and which remains now unpaid, for which he claimed a lien on the vessel for his security, and praying that the vessel may be decreed subject to the lien and sold for the payment of what is due. Spear was duly served with process, but did not appear; but [John] Purinton, intervening for his own interest, entered an appearance and filed a claim as owner, and put in an answer, in the nature of a plea to the jurisdiction, alleging, that at the time when the labor is said to have been per-

[1] [Reported by Edward H. Daveis, Esq.]
[2] [Affirmed in Read v. Hull of a New Brig, Case No. 11,609.]

formed, the vessel was, and ever since has been, wholly owned by citizens of this state, viz., by said Purinton, the respondent; that she is a domestic vessel; and concluding with a prayer that the libel may be dismissed. Afterwards, upon a suggestion from the court that the objection to the jurisdiction could not be sustained, he put in an answer to the merits, alleging that the vessel was built by Spear for him, denying all knowledge of the libellant's having been employed, or having rendered any service, in building the vessel, and putting him to the proof of his claim. Evidence of the declaration of Spear was offered by the libellant, tending to prove that, by the terms of the contract, he was specially engaged for work upon this vessel; but the evidence was ruled to be inadmissible.

Mr. Fox, for libellant.
C. S. Davies, for respondent.

WARE, District Judge. The plea to the jurisdiction has been very properly abandoned at the argument. The objection was presented in precisely the same form in the case of Peyroux v. Howard, 7 Pet. [32 U. S.] 324; that is, that all the parties were citizens of the same state, and overruled in both the district and supreme court. The same question was also raised and decided in the same way in the case of Davis v. New Brig [Case No. 3,643]. In cases of admiralty and maritime jurisdiction, the competency of the court does not depend on the citizenship of the parties. The jurisdiction is founded on the subject-matter, and attaches, whoever may be the parties, and wherever they may reside. And, that contracts of material-men, for materials found and labor performed in building and repairing vessels, are matters of admiralty and maritime jurisdiction, has been too often decided to admit of controversy at this day. Over these contracts the admiralty exercises a general jurisdiction. It will, in all cases give a remedy in personam; and whenever the law gives a lien or privilege against the vessel, it will enforce it by process in rem. The General Smith, 4 Wheat. [17 U. S.] 438; The Aurora, 1 Wheat. [14 U. S.] 105; The Jerusalem [Case No. 7,294]; The Robert Fulton [Id. 11,890]; The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409; Gardner v. The New Jersey [Case No. 5,233]; North v. The Eagle [Id. 10,309]. In every proceeding in rem, therefore, founded on such contracts, the question is not, whether the court can take cognizance of the subject-matter, but simply whether, in the particular case, the creditor has a right to look to the vessel itself for his security, or is confined to his personal remedy against the debtor.

By the general maritime law, materialmen, under which term, in the language of the admiralty, are included all persons who supply materials or labor in building or repairing vessels, or furnish supplies which are necessary for their employment, as provisions for the crew, have, in addition to the personal liability of the debtor, a lien on the vessel for their security. Ordinance de la Marine, liv. 1, tit. 14, art. 16; 1 Valin, Comm. 363; Consulat. de la Mer. cc. 32–34 (Boucher's Translation); Cleirac, Jurisdiction de la Marine, p. 351, art. 18, Nos. 4, 5. It is commonly said that this principle was borrowed by the maritime, from the civil law. Abb. Shipp. pp. 108, 109. But it seems more probable that it originated in the maritime usages of the Middle Ages, where we find the origin of all the general principles of the law of the sea. The Roman law did, it is true, allow to those who loaned money for the building, repairing, or the supplying of vessels, a privilege against the vessel. Dig. 20, 4, 5, 6; Dig. 42, 5, 26, 54. But in that law a privilege did not amount to an hypothecation. Peckius, ad Rem Naut., Note of Vinnius, b, p. 233; Voet, ad Pand. 20, 2, 29, and 20, 4, 19; Vinnius, Select. Juris. Quaest. lib. 2, c. 4; Heinn. ad Pand. par. 6, § 263. The first only gave a jus praelationis, a right of prior payment out of the thing, before it could be taken by unprivileged creditors. It was like the priority laws of the United States, and did not attach as a lien on the thing. And the privilege of material-men, for supplies furnished for a vessel, was also postponed to that of the fisc. But hypothecation gives a jus in re, a species of proprietary interest in the thing itself. And in the maritime law every privilege imports a tacit hypothecation. Emerigon, Contrats a la Grosse, c. 12, §§ 1, 2. If, therefore, it was adopted from the Roman law, it was adopted, with an important modification, giving to the privileged the rights of an hypothecary creditor, and raising the privilege to an hypothecation.

But this principle of the maritime law is not acknowledged by the common law, and has never been received by the commercial jurisprudence of England. Abb. Shipp. 109. It has, however, been partially adopted in the maritime law of the United States. Our law allows the lien when the supplies are furnished to a foreign vessel; and, for the purposes of the lien, a vessel is considered as a foreign vessel, when she is in a port out of the state to which she belongs or where her owners reside. But when supplies are furnished to a vessel, in the state where she belongs and is owned, no lien is created by the maritime law of the United States. If, however, it is allowed by the local laws of the state, it may be enforced by process in rem in the admiralty.

In the present case, the labor was performed on a new vessel, owned in the place where she was built, and, being a domestic vessel, whether the creditor has a lien upon her for the value of his services, depends entirely on the law of the state. The lien

is claimed under an act of the legislature of Maine, of Feb. 19, 1834, c. 626, § 1. This act provides, "That from and after the passing of this act, all ship-carpenters, calkers, blacksmiths, and joiners, or other persons, who shall perform labor or furnish materials for and on account of any vessel building or standing on the stocks, by virtue of any written or parol agreement, shall have a lien on such vessel for his or their wages, until four days after said vessel is launched, and may secure the same by an attachment on said vessel; which attachment shall have precedence of all other attachments where no such lien exists." That labor was actually performed by Read in the building of the vessel, has been sufficiently proved, and is not now denied. The question which has been discussed at the bar is, whether it was performed under such circumstances as entitle him to the benefit of the law. For it is not sufficient that materials be furnished, or labor and service rendered, in the construction of a vessel. This must be done by virtue of an agreement; and what sort of an agreement will bring a party within the privilege of the act, is the precise question which is involved, and has been learnedly argued, in this case.

There was no written contract between the parties, and there is no direct proof of the terms of agreement by which Read was engaged. They are left, by the testimony, to be inferred from the circumstances under which the engagement was made, and the manner in which the contract, whatever it might be, was executed. It appears that, about the 16th or 17th of April, Read came to the house of Capt. Spear, the builder, a stranger, and by birth a foreigner, in a state of great destitution, and wished for employment. Spear took him into his house, furnished him with some clothing, and employed him a few days for his board. He then left and went to Portland to seek business, but not being successful in obtaining it, he returned, and was again employed by Spear, and continued in his service until November, when he was finally discharged. For the first month he was employed exclusively in gardening, planting, laying stone wall, and other labor on the farm. About the beginning of June he went into the smithery, and was engaged part of the time at his trade as a blacksmith, in doing the iron work for the vessel. Butman, one of the witnesses, who was also employed as a blacksmith for two months and eight days from the 19th of May, says that during that time he constantly worked with Read, and that about half the time they worked in the shop, and about half the time on the farm, on the highways, in the woods getting timber, and various work. After that period and until Read was finally discharged, his employment was not wholly, but more exclusively, upon the vessel, either in the shop preparing the iron work, or in the yard boring on the ship.

While in the smithery, however, he was not wholly occupied in work for the vessel, but occasionally did other jobs which were brought by the neighbors to the shop, but all on Spear's account. The proportion of the time employed upon the vessel is not clearly proved, but is estimated by some of the witnesses as about three-fourths of the whole period from the commencement to the close of his employment.

It has been already observed, that the statute does not create a lien for labor and materials, upon the simple and naked fact that they have been actually employed in the building of the vessel; the lien arises only when the materials and labor are furnished by virtue of a previous agreement. The argument of the libellant's counsel is, that the performance of the labor, or the supply of the materials, having been proved, and the actual appropriation of them to the finishing of the vessel, it is unnecessary to proceed further and show the agreement in pursuance of which it was done; but the fact that it was done in the execution of a previous contract, results as a presumption of law. To a certain extent this is undoubtedly true. If labor has been performed for another with his knowledge and under his direction, or goods have been furnished, received, and consumed by him, the law will certainly imply from these facts an agreement. But what agreement will be presumed? Why, on the part of the person who receives the benefit, that he agreed to pay what they were reasonably worth, and, ordinarily, nothing more. Suppose a man who is by trade and occupation a ship-builder, hires a laborer to work for him a year, but the particular terms of the agreement, except its duration, are not susceptible of proof. The law will imply nothing more than that he should perform such services as are usually required of hired laborers, and, after the contract is executed, that the hirer shall pay him a reasonable compensation for such services. Again, suppose such a ship-builder to purchase a quantity of lumber suitable for ship-building; if the particular terms and conditions of the contract do not appear, the law will imply nothing more on the part of the purchaser, ordinarily, than a promise to pay what it is worth. A contract or agreement requires, as essential to its existence, the assent of two or more minds; "duorum vel plurium in idem placitum consensus." Dig. 2, 14, 1, 51. If particular pacts or conditions are annexed to the contract, qualifying its general nature, or varying and modifying its general obligations, there must be the same assent of the parties to these conditions to give them validity, as to the substance of the contract. It must be a consent in idem placitum. If the parties have not taken care to express these accessory conditions in the terms of the contract, or what juridically amounts to the same thing, if they cannot be proved, the law will not presume the as-

sent of the parties to them, unless, from the circumstances of the case, or the ordinary course of dealing, these are plainly to be inferred.

Let us now apply these general and familiar principles of law to the evidence in this case. The fact that the libellant labored for Spear, and under his direction, from April to November, and that he was part of the time employed upon the vessel, is admitted. That the labor was performed by virtue of an agreement, will be inferred as a presumption of law. But the law will infer, from the general fact, nothing more than a general contract for labor; and what is there in the present case that will authorize the presumption of anything beyond this? Nothing, except what results from the manner in which he was actually employed, and the fact that he was a blacksmith by trade. As to the kind of labor in which he was employed, it appears that for the first month he was exclusively occupied in various work on the farm; for the two following months, about one-half of the time on the farm, and one-half in the blacksmith's shop; and during the residue of the term of his service, principally in the shop at his trade, in doing the iron work for the vessel, or in the yard working on the ship; but part of it, also, on the farm. Taking, then, the whole course of his employment, the result will be against this presumption of a special contract with him as a mechanic, for labor on the vessel. Whatever presumption might arise from the fact that he was by trade a blacksmith, is overcome by the various kinds of labor in which he was actually employed without any objection on his part. The inference certainly is, that he was hired rather as a Jack-at-all-trades, than as a master of one. And this receives confirmation, partially at least, by all the evidence which has been offered touching the rate of wages for which he was engaged. It appears from his own declaration, that Spear would consent to give him but fourteen dollars a month, though he said he ought to have sixteen. But all the proof is, that the rate of wages for a blacksmith at this time, was not less than a dollar a day, about double the rate at which he was to be paid. It appears to me that the fair conclusion to be drawn from all the facts is, that this was a general agreement for service as a hired laborer, and not a special contract for any specific kind of labor.

Does a person, hired as a laborer generally, and employed under that general contract part of the time in work upon the vessel, come within the fair intent and meaning of the legislature, so as to be entitled to a lien on the vessel for his wages, during that part of the time that he is so employed? The language of the law is, that any persons of the description named in the act, who shall perform labor and furnish materials for or on account of any vessel, by virtue of a written or parol agreement, etc. The labor must be performed, or the materials furnished, in pursuance of an agreement, and it must be an agreement to do this for, or on account of, the vessel to which the lien attaches. The intention of the law is, to give to that class of persons called, in the language of the admiralty, materialmen, a privilege against the vessel for their security, not universally and in all cases where their labor or the materials furnished by them have been applied to the building of a vessel, but where this has been done under a contract for, or on account of, the vessel to the use of which they have been appropriated. The contract must therefore have itself a reference, tacit or express, to the vessel against which the privilege is claimed. It is not intended to be said that, in all cases, a mechanic who is employed in building a vessel, or a material-man who sells lumber which is used in the construction of it, must, in order to maintain their lien, prove that the vessel was expressly named in the contract. In ordinary cases, or certainly in very many cases, this will be presumed. And these contracts being made while the vessel is in the process of building, and the labor or materials appropriated to her construction, it would require some countervailing circumstances to overcome the natural presumption that the contracts were made with a view to the particular vessel. I fully agree with the libellant's counsel, that the lien being one beneficial to the general interests of commerce, and having its foundation in natural equity, the law ought to receive a liberal construction, to carry into full effect the beneficent intentions of the legislature. It belongs to that class of liens which the law habitually favors. And the act, being in fact but a mere recognition or adoption of a principle of the general maritime law, as old as the law itself, a court of admiralty would be the last tribunal to feel any reluctance in giving to it its fullest and most beneficial operation. But to extend the privilege to a case like the present, would be carrying the lien beyond what seems to me to be the obvious and clear intention of the legislature, and also further than it would be supported by the principles of the general maritime law. Libel dismissed.

[NOTE. Libellant appealed to the circuit court, where the decree of the district court was affirmed. See Read v. Hull of a New Brig, Case No. 11,609..

[That liens on domestic vessels, maritime in their character, given by a state statute, may be enforced in admiralty, see 'The Eliza Jane, Case No. 4,363; Wick v. The Samuel Strong, Id. 17,607; The Lillie Mills, Id. 8,352; The Alida, Id. 199; The Infanta, Id. 7,030; Dudley v. The Superior, Id. 4,115; Weaver v. The S. G. Owens, Id. 17,310; The Richard Busteed, Id. 11,764; The Robert Fulton, Id. 11,890; The Stephen Allen, Id. 13,361; Boon v. The Hornet, Id. 1,640; Zane v. The President, Id. 18,201; Davis v. A New Brig, Id. 3,643; Ashbrook v. The Golden Gate, Id. 574.]